Good morning, Your Honors, and may it please the Court. I'm David Becker here on behalf of Appellants Our Money Our Transit and Robert Mascheroni. I'm going to try to reserve two minutes for rebuttal. And in the interest of time, I want to focus on the FTA's failure to consider the West 13th, West 11th Avenue alternative because this Court has never held that a federal agency can avoid a full and meaningful consideration of an undisputedly reasonable alternative in an environmental assessment. And this would be an unprecedented ruling to affirm in this case. What are you saying? This Court has never held that an agency can't – when there's no dispute that a particular alternative is reasonable, as the district court found here that the West 13th, West 11th Avenue alternative was a viable alternative. This Court has never said, has never held that that can be – that the federal agency can avoid giving that full and meaningful consideration. Well, you say that, but why would we have occasion to say anything like that? I mean, you first of all have to have a requirement that all reasonable alternatives must be considered. That's right, Your Honor. You have to start with that. And it's only when you start with that kind of requirement that you would have occasion to say what you say we've never said. But there's no such requirement. There's no requirement that the agency consider every viable alternative. There is the requirement. But where does that – From the Western Watersheds Project case, relying on Section 102.2e of the statute, there is the requirement that all reasonable alternatives get detailed evaluation in an EA. The argument that the federal – Why isn't the – why isn't the agency entitled to consider an alternative and a no-action alternative, which is what happened here, action and no action? Because – There are lots of cases that say that's fine. But that's not – that's not a – all of those cases involved situations where the alternatives that were rejected by the agency, first of all, they gave explanations why they were rejecting them, but they were never – they never have rejected a reasonable alternative. There's always been an issue of feasibility that an alternative that was rejected was unfeasible – is infeasible or it was too costly or, much more frequently, it didn't meet the purpose and need of the case. So in none of the cases that – where this Court has said you can have a preferred alternative and a no-action alternative, was there, as in this case, an available, reasonable alternative that meets all the purpose – meets the purpose and need of the project? But this was shared – this alternative was shared with the public, and there was very little public support for it, and that's why they didn't go on to do a more detailed analysis, correct? But, again, the purpose of the alternatives analysis that led to the locally preferred alternative, that's a very limited process. And here it was done outside of the NEPA process. The purpose of the alternatives analysis under the regulations is only to identify what the locally preferred alternative is. It is not a restriction on the Federal Transit Administration's obligation under Section 1022e to evaluate reasonable alternatives. You know, I – What is it the local community doesn't want or doesn't need or doesn't – you know, it's just crazy. The local – the – the – What would be the point of considering alternatives that the community doesn't prefer or doesn't want? And, again, if you look at – Why isn't an agency entitled to say, look, we're going to look at the things that the community wants, consider that, and consider the no-action, and those are the two things that we consider? The holding in western watersheds project, this court said there had to be three things considered. There had to be the full grazing – the full grazing alternative, a true no-action alternative, no grazing, but the court also held that the reduced grazing alternative, which the ranchers in that case certainly didn't want, had to be considered. You know, I would – I would feel differently about this case if I thought that the alternative that you want to have been considered as part of the environmental impact requirement looked as if it were radically or substantially different from an environmental standpoint. What these really are are two different routes, and we've got a NIMBY problem. Your clients don't want it along their street. The other people don't want it along their street. That's right. And that's why politically, in the end, I mean, they fought it out, and politically the powers that be decided they're going to do it on this street. But if this were a case where there were seriously different environmental impacts from the standpoint of water, air, natural resources, animals, and so on, I might be inclined to agree with your argument. But the alternative you want is just another street. But, again, Your Honor, the purpose of the alternatives analysis is not just to compare specific environmental impacts like you said, but it's also to form a basis of reasoned decision-making and informed decision-making. And in this case, you'd have a situation where – You're here to decide whose backyard this gets built in? Or the – What is the alternative? The alternative is more cars in Eugene instead of – instead of having buses? They should have more people driving cars? Do you represent people who's automobile dealers, perhaps? Is that who your clients are? No, Your Honor. The – You're going to have buses running either – on either alternative. I mean, there's no dispute here that the project – that either the project is going to be built on one of these alternatives or the – How do you then satisfy your burden to show standing if there are going to be buses in either way? You've got a single affidavit saying it's going to affect my asthma. If you just said, you know, there are going to be buses either way, how do you – Why is there standing? Why did we dismiss this case for lack of standing? Because the alternative that would have routed buses away from where my client has his shop wasn't considered. So the only project that was considered in the EA was the one that directly affects, and that's all that's necessary under NEVA. And is things that your client claims, those kind of things that will support standing? I mean, you know, the effect on air quality and – I mean, one effect will be that you'll have more cars going through there, and actually the air will get worse without the buses. Except that – How do we have sort of the concrete injury that is necessary to show standing? As we addressed in the reply brief, right at the intersection 20 feet away from the door of the shop that he works in, the lanes are being reduced for through traffic from three to two. So there's going to be the same volume of cars backing up behind the intersections. There's going to be more fumes, more idling. Why – how do we know that people won't reroute? Because there's nothing – In what ways? The EA finds that there's not going to be rerouting around into neighborhoods, but the travel analysis doesn't include any information about how many cars are going to be taken off the road by including the bus rapid transit system. There is going to be a – there's going to actually be a reduction in the lanes available for cars. Well, you said they won't reroute through the neighborhoods. It doesn't mean they won't reroute through major – through other major arteries. But again, Your Honor, you're supplying a rationale the agency itself didn't. People are not – people are not – well, no, we're looking at standing here. We're looking at standing. You're making an argument that there is standing because people are going to be idling more, and this presupposes that the same number of people are going to be on the street when they reduce the lanes from three to two. But, you know, it's just contrary to common sense. People know that this artery has been reduced, that there is more traffic back up. They reroute. This is what people do. People sit in traffic. Or maybe some of them get on these buses that they now have. People sit in traffic all the time, Your Honor, because that's the route that they've always gone through. You have the burden as a – to show standing, and I'm just not sure how you've managed to satisfy that. This is not a question like, oh, you know, I used to go to the lake, or, you know, I used to go fishing there. Now the lake is going to be gone. I can't fish or I can't go camping because they've cut down the trees or anything like that. This is just highly speculative, the impact on your client. But he has given this as sworn testimony, and the impacts that are going to occur on the additional traffic congestion that he's also going to have to experience I think are one of the issues that we believe that the agency didn't address and didn't take a hard look at. I'm going to reserve my time. Okay. Thank you. Good morning. I'm Rafe Peterson, and I represent Lane Transit District. This alternative that they're speaking of, it's not undisputably reasonable. We're reasonable even the bellwether for what alternatives have to be considered under NEPA. This alternative was chosen following 1,200 comments on the alternatives alone. The LPA meets the purpose and needs of the project, and that's why it was chosen. And the agency has the discretion to make those choices. And it is perfectly acceptable to eliminate alternatives in a preliminary analysis pursuant to the NEPA regulations as well as to the case law. And that's exactly what happened, and it's laid out in the environmental assessment where there's a provision where it talks about alternatives considered and then eliminated. And under their standard, there would be no end to the NEPA process if the EA also had to discuss all the alternatives that were eliminated in the first place, especially when you look at what we're dealing with here. They're putting buses on existing roads, and they're choosing routes for buses. There are probably 100 different, quote, reasonable ways you could do that, and it's just not up to the court to dictate which would be the most reasonable alternative, which is exactly what they're asking to be done. Do you have a question about standing? Yes, I have quite a bit. Not only do they not want this project on a different street, they don't want it at all. From the very beginning of the formation of this group, OMOT, and their president, they wanted to stop the project. They see it as a waste of taxpayers' money. They do not have prudential standing, and do not have constitutional standing. By wanting to kill the project, they fall outside of what NEPA does. The purpose of NEPA is to have process and is to go through the processes that the agencies have complied with. NEPA does not allow. NEPA is used all the time to stop projects. They may say, I want to save the frog, but the truth is not only do they want to save the frog, they want to stop the project. So for you to say they don't have standing because all they want to do is stop the project is, hey, that sounds like they've got standing to me unless you tell me something else. Sure. Well, those are different types of cases. This isn't the Sierra Club going up against a power plant. This is a group of taxpayers that have figured out the only way they can challenge the allocation of this money is to cloak themselves as if they suddenly have environmental purposes. And nothing they've ever said before standing was challenged has ever suggested that they have any environmental purposes whatsoever. They're a taxpayer group that simply doesn't, they say that money shouldn't be spent. Well, that's fine, but that isn't the type of analysis that's done under NEPA. And their injury claimed is not remotely particularized. Sitting in traffic, as was said here, is something that a lot of other people are enduring and is not going to change. But the plaintiff is not arguing standing because he's sitting in traffic. He's arguing standing because the traffic will have an adverse impact on him the way it's been rerouted under the proposed plan. The traffic, well, a couple things. It's not redressable, what he's doing. The traffic is inevitably going to be there one way or another. I don't know from the way he talks about it. It sounds as though it's perfectly redressable. Just send the buses on another route. He'll be happier. Now, other people will be unhappier, but I'm not sure that the fact that it goes on another route saving him, I mean, that sounds like it's a perfectly rational basis for standing. For me, you might win on the merits, but the standing argument for me doesn't work very well. I don't speak for my colleagues. Okay, thank you, Your Honor. The test isn't whether he's happy. The question is whether he has an injury, whether he has a concrete injury from the project, right? Yes, correct. People are always unhappy, otherwise they wouldn't be challenging the project. Correct. In this case, his injury is extremely tenuous. I mean, it is related to pollen. There's nothing in the record that somehow these clean buses create pollen. It is related to emissions. Well, these clean buses aren't adding any emissions. They're not adding a road here. They're reusing existing roads, and they're adding some curbs and some bus stops. His suggested injury is extremely remote, and it's not particularized or different than any other person walking down that road or that has a business there. The agency did not analyze increase in travel times or travel congestion as an impact on the human environment as part of the NEPA analysis, near as I could find. Why is that not relevant, traffic congestion and impact on the increase in travel times down the street? They most certainly did, Your Honor. This case has been about flyspecking. There is a statement in the draft traffic report that talks about something called queuing, which is a type of traffic analysis that, frankly, isn't used by the City of Eugene, and it isn't used by ODOT. So there's an entire chapter and a study supporting it that looks at traffic based on level of service and based on volume to capacity, and these are the two methodologies mandated by the City of Eugene and mandated by ODOT. The traffic analysis was peer-reviewed by both, and it was found convincing, and it was found accurate. And basically, both of what these studies show is that there is going to be either improvements in traffic under current conditions or it's going to remain the same. I mean, this is a transit project. Traffic was at the heart of all of this. Do you reserve time for your colleague? Yes, I believe I had seven and a half minutes. If I've used it, I'll... No, it was ten minutes altogether, so you had five. Yes, I'll reserve time. I'm sorry, I misread the order that we got today. May it please the Court, Brian Kipnis for the Federal Transit Administration. There is one point that counsel for the plaintiff made that I take strong issue with, which is the notion of why we have NEPA and what the purpose of NEPA is. NEPA is not to choose the best project, the correct project, the most environmentally friendly project. None of those are the purpose for NEPA. The true purpose of NEPA is to illuminate environmental impacts and to having those environmental impacts out on the table so that the decision-makers can take that information and choose the right project and to take that information to mold the project to avoid, if possible, significant environmental impacts or environmental impacts in general. It is never the case that an agency or, in this case, a state program, necessarily has to implement the project that is studied in a NEPA analysis. That is simply the model that is used to illuminate the environmental impacts. Certainly that was the case here. This particular route would reflect environmental, as was pointed out, the environmental impacts associated with this particular route are no different than the environmental impacts associated with a route one block over, which is what counsel for plaintiff's appellant is talking about. You have no, this is a bus transit project. It doesn't involve ground-disturbing activity. It doesn't involve destruction of habitat. It doesn't have impacts on water resources. Wetlands aren't affected. Species are not harmed. They're protecting trees. They're mitigating. There is tree removal associated with this project, but they are mitigating one for one. Every effort was made in the design of this project to avoid environmental impacts, and that was successfully done by the district, and that's why a project that was originally thought to necessitate an EIS ended up necessitating an environmental assessment. This project is environmentally friendly. That's reflected in the environmental assessment. That's reflected in the FTA's FONSI, and as a consequence, Your Honor, I believe the decision was correct and should be affirmed by this court. I'm happy to answer any questions you might have. Thank you. Thank you, Your Honor. We have a little time left. Forty-two seconds. Thank you, Your Honors. The focus of the reason for the alternatives analysis here, to go to Judge Fletcher's question, is that it has an independent function in making sure that the FTA is making an intelligent decision. They were deprived of the opportunity to get a comparison in detail of the effects on traffic of these two alternatives. The preliminary alternatives, the preliminary study found that the West 13th, West 11th route was less costly, would have fewer environmental impacts, save about 37 percent of the time. So there are significant differences, but in deciding whether to spend $75 million, they didn't compare in detail these two reasonable alternatives as this Court's case law requires. Thank you, Your Honor. The case is argued and will stand submitted.
judges: Kozinski, W. Fletcher, Tunheim